## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL NO. _____ |
| | : | 0 8 - 0 3 5 |
| Plaintiff, | : | VIOLATION: 18 U.S.C. § 371 |
| | : | |
| v. | : | |
| | : | |
| FLOWSERVE POMPES SAS, | : | **FILED** |
| | : | |
| Defendant. | : | FEB 2 1 2008 |
| | : | Clerk, U.S. District and Bankruptcy Courts |

### INFORMATION

1.    The United States Department of Justice, Criminal Division, Fraud Section, charges that at all times material to this Information (unless otherwise specified):

### GENERAL ALLEGATIONS

LEON, J. RJL

*Relevant Entities and Individuals*

2.    Flowserve Pompes SAS ("Flowserve Pompes"), the defendant, was a French corporation, headquartered in Arnage, France.    Flowserve Pompes was a wholly-owned subsidiary of Flowserve Corporation ("Flowserve").

3.    Flowserve, a New York corporation, was an international manufacturer of pumps, valves, seals, and related parts for the oil, gas, and chemical industries, headquartered in Irving, Texas. Flowserve was publicly traded on the New York Stock Exchange. Flowserve issued and maintained a class of publicly-traded securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78l, and was required to file periodic reports with the United States Securities and Exchange Commission under Section 13 of the Securities Exchange Act, 15 U.S.C. § 78m. Accordingly, Flowserve was an "issuer" within the meaning of the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78dd-1(a). By virtue of its status as an

*Case related to case 07-253*

issuer within the meaning of the FCPA, Flowserve was required to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflected the transactions and disposition of assets of Flowserve and its subsidiaries, including those of Flowserve Pompes, the books, records and accounts of which were incorporated into the books, records and accounts of Flowserve.

4.      Employee A, a citizen of Lebanon, was the Beirut Regional Manager for Flowserve Pompes located in Beirut, Lebanon.

5.      Employee B, a dual citizen of Algeria and France, was the General Manager for Flowserve Pompes located in Arnage, France.

6.      Employee C, a citizen of Lebanon, was the Beirut Area Manager for Flowserve Pompes located in Beirut, Lebanon.

7.      Employee D, a citizen of France, was the President of Flowserve Pompes located in Arnage, France.

8.      Company X, was a Jordanian company that acted as an agent for Flowserve Pompes in connection with sales made through the United Nations Oil-for-Food Program ("OFFP").

### *The United Nations Oil-For-Food Program*

9.      On or about August 6, 1990, days after Iraq's invasion of Kuwait, the United Nations ("U.N.") adopted Security Council Resolution 661, which prohibited U.N. member-states from transacting business with Iraq, except for the purchase and sale of humanitarian supplies.   Resolution 661 prohibited virtually all direct financial transactions with the government of Iraq.

10.     On or about April 15, 1995, the U.N. adopted Security Council Resolution 986, which served as a limited exception to the Iraq sanctions regime in that it allowed Iraq to sell its

oil. However, Resolution 986 required that the proceeds from oil sales be used by the Iraqi government to purchase humanitarian supplies, including but not limited to food, for the Iraqi people. Hence, this program became known as the Oil for Food Program. Payments made to the Iraqi government which were not approved by the U.N. and which were outside the strict contours of the OFFP were prohibited.

11.    The rules of the OFFP required that the proceeds from all sales of Iraqi oil be deposited into a U.N.-controlled escrow account at the New York branch of Banque Nationale de Paris ("BNP-Paribas"). That escrow account funded the purchase of humanitarian goods by the Iraqi government.

12.    Under the rules of the OFFP, a supplier of humanitarian goods contracted with a ministry or other department of the Iraqi government to sell goods to the government. Once that contract was finalized, the contract was submitted to a U.N. Committee ("the 661 Committee") which reviewed the contracts to ensure that their terms complied with all U.N., OFFP, and Iraqi sanction regulations. The 661 Committee accepted the contracts, rejected them or asked the supplier to provide additional information upon which the 661 Committee could make a decision.

13.    If a contract was approved by the 661 Committee, a letter of credit was issued by the New York branch of BNP-Paribas to the supplier's bank stating that the supplier would be paid by the OFFP for the relevant goods once certain conditions were met, including delivery of the goods to Iraq and inspection of the goods by a U.N. contractor. Once those conditions were deemed by the U.N. to have been met, the U.N. would direct BNP-Paribas to release payment to the supplier.

14.    On or about December 10, 1996, the first Iraqi oil exports under the OFFP began. The OFFP continued from in or about December 1996 until the United States invasion of Iraq on

3

or about March 19, 2003. From in or about December 1996 through March 2003, the United States government prohibited United States companies and individuals from engaging in transactions with the government of Iraq, unless such transactions were authorized by the U.N. pursuant to the OFFP.

15.     Beginning in approximately August 2000, the Iraqi government demanded that suppliers of humanitarian goods pay a kickback, usually valued at 10% of the contract price, to the Iraqi government in order to be awarded a contract by the government. These kickbacks violated U.N. OFFP regulations and sanctions which prohibited payments to the Iraqi government which were not expressly approved by the U.N. and which were not contemplated by the guidelines of the OFFP.

16.     Often, these kickbacks were termed "after sales service fees" ("ASSFs"), but did not represent any actual service being performed by the supplier. These ASSFs were usually included in the contract price submitted by the supplier to the U.N. without the U.N. knowing that the contract contained an extra 10% which would be returned to the Iraqi government. Including the 10% in the contract price allowed the supplier to avoid paying the 10% out of its profits; instead, the suppliers caused the U.N., unknowingly, to fund the kickbacks to the Iraqi government.

17.     Some suppliers labeled the ASSFs as such, thereby leading the U.N. to believe that actual after-sales services were being provided by the supplier. Other suppliers disguised the ASSFs by inserting fictitious line items into the contracts for goods or services that were not being provided. Still other suppliers simply inflated their contract prices by 10% to account for the payments they would make, or cause to be made, to the Iraqi government.

*Flowserve Pompes' Kickback Scheme*

18.    From approximately 1997 to 2003, Flowserve Pompes participated in the OFFP.
From in or about April 2001 through September 2002, Flowserve Pompes was awarded a total of
nineteen (19) OFFP contracts for the sale of large-scale water pumps and spare parts for use in
oil refineries in Iraq.    To obtain these contracts, from July 2002 through February 2003,
Flowserve Pompes paid, directly or indirectly, or offered to pay, approximately $778,409 in
kickbacks to the government of Iraq.

19.    Flowserve Pompes entered into the first of the nineteen (19) direct contracts with
the Iraqi Ministry of Oil in April 2001.    Employees from Flowserve Pompes' Beirut, Lebanon
sales office negotiated the contracts with Iraqi government officials.    Once the contracts were
negotiated, employees from Flowserve Pompes' Arnage, France office approved the contracts.

20.    To obtain the Iraqi contracts, Flowserve Pompes agreed to pay the Iraqi
government kickbacks worth 10% of the total contract value.    To memorialize the kickback
agreement, for most of the contracts awarded by the Iraqi Ministry of Oil, Flowserve Pompes
executed a separate side letter agreement with the Iraqi Ministry of Oil stating that Flowserve
Pompes would pay 10% of the contract price to cover ASSFs such as "engineering services,
installation, and commission."    It was understood by the Flowserve Pompes officials and the
Iraqi government officials that, despite the language of the side letter agreement, no such
services would be performed and that the payments were kickbacks in exchange for the award of
the contracts. The side letter agreement was not disclosed to the U.N.

21.    Flowserve Pompes paid the kickbacks to the Iraqi government through its agent,
Company X. On or about the date of each of Flowserve Pompes' shipments to Iraq, Company X
sent an invoice to Flowserve Pompes requesting reimbursement for either "local technical
services provided on your behalf" or "payments made on your behalf."    Flowserve Pompes then

issued a payment to Company X within days. Company X paid the kickback to the Iraqi government by depositing cash into an Iraqi-controlled account in the Jordanian Housing Bank for Trade and Finance.

22.    Flowserve Pompes falsified internal accounting records to conceal the nature of the payments to the Iraqi government. These records made it appear that Flowserve Pompes had paid its agent, Company X, a 10% fee on each contract to pay for Company X's installation and service of the equipment, even though Flowserve Pompes knew that Company X had provided no such services and that the 10% fee was a kickback to the Iraqi government.

23.    In order to generate the funds to pay the kickbacks to the Iraqi government and to conceal those payments from the U.N., Flowserve Pompes inflated the unit price of each piece of equipment by 10% before submitting the contracts to the U.N. for approval.

24.    After the U.N. approved the contracts, BNP-Paribas issued letters of credit, via international wire communication, to the bank used by Flowserve Pompes, in the amount of the contract price. These letters of credit authorized Flowserve Pompes to be paid the amounts specified in the contracts, which included the 10% kickbacks to be paid to the Iraqi government.

25.    In total, Flowserve Pompes paid kickbacks to the Iraqi government in relation to fifteen (15) separate contracts. In addition, Flowserve Pompes offered to pay kickbacks to the Iraqi government in relation to four (4) other contracts. Delivery under the four (4) additional contracts was not completed prior to the U.S. invasion of Iraq in March 2003, after which the Coalitional Provisional Authority ordered that the Flowserve Pompes' contracts be reduced by 10%.

# COUNT ONE
## (Conspiracy)

### THE CONSPIRACY AND ITS OBJECTS

26.     Paragraphs 1 through 25 of this Information are re-alleged and incorporated by reference as if set out in full.

27.     From in or about April 2001 through in or about February 2003, within the territory of the United States and elsewhere, Flowserve Pompes, Employee A, Employee B, Employee C, Employee D, Company X, and others known and unknown, did unlawfully and knowingly combine, conspire, confederate and agree together to commit the following offenses against the United States:

        a.     to knowingly devise, and intend to devise a scheme and artifice to defraud the U.N. and the Oil-for-Food Program, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, through the use of interstate and foreign wire communications, in violation of Title 18, United States Code, Section 1343; and

        b.     to knowingly falsify and cause to be falsified books, records, and accounts required to, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of Flowserve, an issuer within the meaning of the FCPA, in violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5) and 78ff(a).

## PURPOSE OF THE CONSPIRACY

28.    The primary purpose of the conspiracy was to obtain and retain lucrative business with the Iraqi government through the payment of kickbacks to the Iraqi government which were concealed from the U.N. and falsely portrayed as legitimate charges.

## MANNER AND MEANS OF THE CONSPIRACY

29.    To achieve the objects of the conspiracy, Flowserve Pompes and others known and unknown used the following manner and means, among others:

a.    It was part of the conspiracy that Flowserve Pompes agreed to pay kickbacks, and caused kickbacks to be paid, to the government of Iraq in exchange for contracts being awarded by the Iraqi government.

b.    It was a further part of the conspiracy that Flowserve Pompes utilized Company X for the purpose of facilitating the payment of, and concealing, the kickbacks.

c.    It was a further part of the conspiracy that Flowserve Pompes submitted contracts to the U.N. for approval which failed to disclose, and concealed, the fact that the unit prices of the equipment sold to the Iraqi government had been inflated by 10% in order to generate money to pay the kickbacks to the Iraqi government.

d.    It was a further part of the conspiracy that Flowserve Pompes caused the transmission of international wire communications, to and from the United States: (i) to provide notice to the U.N. that Flowserve Pompes goods had been shipped to, and inspected in, Iraq; and (ii) to provide notice to banks used by Flowserve Pompes that the U.N. had authorized payments pursuant to the contracts.

e.    It was a further part of the conspiracy that Flowserve Pompes falsely described the kickbacks paid to the Iraqi government in its corporate books, records and accounts

as payments to Company X for "Field Services" including "supervision, installation, commission, [and] startup."

## OVERT ACTS

30.    In furtherance of the conspiracy and to accomplish its unlawful objects, the following acts, among others, were committed within the territory of the United States and elsewhere.

a.    On or about November 28, 2000, Employee A and Employee B, discussed paying the Iraqi government kickbacks in the amount of 10% of the total contract value for all contracts awarded by the Iraqi Ministry of Oil in the future.

b.    On or about January 22, 2001, Employee A sent a facsimile to Employee B requesting authorization to pay the Iraqi government a 10% kickback for contracts in the future and falsely characterized the payment as a charge for "engineering service, installation and commission."

c.    On or about January 23, 2001, Employee B sent a facsimile to Employee A authorizing the 10% kickback and confirming that the kickbacks could be paid because "the mechanism of payment of 10% marketing fees is now in place."

d.    From in or about April 2001 through September 2002, Flowserve Pompes entered into at least nineteen (19) separate contracts with the Iraqi Ministry of Oil.

*Contract DR/08/34*

e.    On or about April 26, 2001, Employee C, on behalf of Flowserve Pompes, executed a contract, referenced by the U.N. as Contract No. DR/08/34, with the Iraqi Ministry of Oil Economic and Finance Department to supply a complete set of "centrifugal pumps with motors" for €110,000, which included an extra 10% to be paid as a kickback to the Iraqi government.

9

f.      In or about April 2001, Employee C, on behalf of Flowserve Pompes, executed a side letter agreement with the Iraqi Ministry of Oil to pay the ministry €10,900 as a kickback for U.N. Contract No. DR/08/34.

g.      From in or about June 2001 to October 2001, Employee C caused a Purchase Order form to be created and submitted to the U.N. for approval under U.N. Contract No. DR/08/34 for the sale of two (2) centrifugal electric pumps in which the unit price was increased 10% and listed as €55,000 per pump.

h.      On or about July 16, 2002, Company X sent an invoice to Flowserve Pompes for €47,612.70, which included the €10,900 kickback payment to be paid to the Iraqi government under U.N. Contract No. DR/08/34, and which falsely characterized the kickback payment to the Iraqi government as a payment for "local technical services provided on your behalf" even though Company X had provided no such technical services.

i.      In or about October 2002, Flowserve Pompes caused Company X to pay a kickback to the Iraqi government in the amount of €10,900.

j.      In or about October 2002, Flowserve Pompes caused two (2) centrifugal electric pumps purchased pursuant to U.N. Contract No. DR/08/34 to be delivered to Iraq, prompting a company based in Geneva, Switzerland, that provided commercial inspection services on behalf of the U.N. in Iraq ("the inspection company") to send a facsimile from Iraq to the U.N. in New York notifying the U.N. that the products had been received and inspected upon entry into Iraq. This notification, in turn, triggered payment by the U.N. to Flowserve of €110,000 for U.N. Contract No. DR/08/34.

*Eighteen Additional Contracts*

k.      In addition to U.N. Contract No. DR/08/34, between in or about April 2001

and in or about September 2002, Flowserve Pompes entered into at least eighteen (18) other contracts with the Iraqi Ministry of Oil in return for which Flowserve Pompes paid or offered to pay kickbacks to the Iraqi government. Flowserve Pompes' execution of each of these contracts was a separate overt act in furtherance of the conspiracy. The total value of the kickbacks paid to the Iraqi government, in connection with a total of fifteen (15) of these contracts, was approximately $604,651. The total value of the additional four (4) kickback payments that were authorized, but not paid, was approximately $173,758. Each kickback that was paid or offered was a separate overt act in furtherance of the conspiracy. These contracts were executed, and the kickback payments were made or offered, on or about the dates specified below:

| U.N. Contract Number | Date of Execution | Contract Value | Items Purchased | Kickback Paid to the Iraqi Government | Kickback Authorized but not Paid to the Iraqi Government |
|---|---|---|---|---|---|
| DR/08/30 | 04/26/01 | € 278,894 | Complete centrifugal pumps | $28,756.59 | |
| DR/08/31 | 04/26/01 | € 737,080 | Complete pumps / complete centrifugal pumps | $77,704.70 | |
| DR/08/32 | 04/26/01 | € 175,934 | Pumps driven by motors/complete centrifugal pumps with motors | $19,883.72 | |
| DR/09/02 | 05/12/01 | € 1,656,077 | New pumps to crude distillation units | $166,169.35 | |
| NGI/09/20 | 06/25/01 | € 37,300 | Diesel pump and spare parts | | $3,688.03 |
| NGI/09/17 | 06/25/01 | € 301,396 | Spare part for existing rotating equipment (pumps) | | $35,157.89 |
| SOC/08/177 | 07/15/01 | € 250,653 | Spare parts for Ingersoll – Dresser pumps | $25,899.25 | |
| SOC/08/179 | 07/15/01 | € 34,590 | Spare parts for fire fighting pumps | $3,552.52 | |

| U.N. Contract Number | Date of Execution | Contract Value | Items Purchased | Kickback Paid to the Iraqi Government | Kickback Authorized but not Paid to the Iraqi Government |
|---|---|---|---|---|---|
| SOC/09/131 | 07/15/01 | € 17,351 | Pump and spare parts for Ingersoll-Dresser Pumps | $1,781.63 | |
| SOC/09/185 | 07/15/01 | € 258,535 | Spare parts for water pump different types & capacities | $26,552.68 | |
| SOC/08/178 | 07/16/01 | € 341,074 | Spare parts for pumps of different types | $33,842.08 | |
| NGI/08/06 | 07/25/01 | € 724,049 | Spare part for existing rotating equipment | $74,364.00 | |
| NGI/08/33 | 07/25/01 | € 161,362 | Pumps with recommended spare parts | $16,011.48 | |
| SRC/08/21 | 08/29/01 | € 721,709 | Spares for existing rotating equipment (pumps) | $71,104.01 | |
| SRC/09/23 | 08/29/01 | € 161,962 | Replacement of damaged pumps with spares | $15,119.52 | |
| DR/08/66 | 08/30/01 | € 315,180 | Pumps complete drive by motors / complete pump with motor | $31, 595.48 | |
| NGI 10/36 | 12/10/01 | € 841,201 | Spare parts for existing rotating equipment | | $89,513.77 |
| GF 11/27 | 9/23/02 | € 421,034 | Spare parts for L.P.G. filling plants | | $45,397.88 |

*Books and Records*

l.      From in or about 2001 through in or about 2003, Employee D and others falsely characterized Flowserve Pompes' kickback payments to the Iraqi government in Flowserve Pompes' books, records and accounts as payments to Company X for "Field Services" including "supervision, installation, commission, [and] startup," even though Flowserve Pompes was aware that Company X had provided no such services and a substantial portion of the money it paid to Company X was being passed on to the Iraqi government in exchange for being awarded contracts.

m.      At the end of Flowserve's fiscal year, in 2001 and 2002, the books, records and accounts of Flowserve Pompes, including those containing false characterizations of the payments to the Iraqi government, were incorporated into the books, records and accounts of Flowserve for purposes of preparing Flowserve's year-end financial statements.

(All in violation of Title 18 U.S.C. §371).

STEVEN A. TYRRELL
Chief, Fraud Section

By:      STACEY LUCK
Trial Attorney, Fraud Section

MARK F. MENDELSOHN
Deputy Chief, Fraud Section

WILLIAM B. JACOBSON
Assistant Chief, Fraud Section

ROBERTSON T. PARK
Assistant Chief, Fraud Section

Criminal Division
United States Department of Justice
1400 New York Avenue, N.W.
Washington, DC 20005
(202) 305-0273

Filed at Washington, D.C., on this **21**st   day of **Feb.**, 2008.

08-035



**U. S. Department of Justice**

Criminal Division

*Fraud Section*
*Bond Building, 4ᵗʰ Floor*
*1400 New York Ave., N.W.*
*Washington, DC 20005*

February 21, 2008

Barry J. Pollack, Esq.
Kelley Drye Collier Shannon
3050 K Street, NW
Washington, D.C. 20007

CR 08-35 (RJL)

**FILED**

FEB 2 1 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

> **Re:  Flowserve Corporation**

Dear Mr. Pollack:

      This letter sets out the agreement ("the Agreement") between Flowserve Corporation ("Flowserve"), on behalf of itself and its wholly-owned subsidiary, Flowserve Pompes SAS ("Flowserve Pompes"), and the United States Department of Justice, Criminal Division, Fraud Section ("the Department") relating to illegal conduct committed by Flowserve Pompes in connection with certain Flowserve Pompes' U.N. Oil-for-Food contracts.  The terms of the Agreement are as follows:

      1.    **Relevant Parties**:  Flowserve, by Flowserve's undersigned attorneys, pursuant to authority granted by Flowserve's Board of Directors, enters into this Agreement with the Department, which shall apply to Flowserve, a New York corporation with its principal place of business in Irving, Texas, and all its affiliates and subsidiaries, including its wholly-owned subsidiary Flowserve Pompes, a French corporation with its principal place of business in Arnage, France.

      2.    **Charges**:  Flowserve accepts and acknowledges that the United States will file a one-count Criminal Information in the United States District Court for the District of Columbia. The Information charges Flowserve Pompes with conspiracy to commit the following offenses against the United States, in violation of Title 18, United States Code, Section 371: (a) wire fraud, in violation of Title 18, United States Code, Section 1343; and (b) falsification of books and records of Flowserve, in violation of the books and records provisions of the Foreign Corrupt Practices Act of 1977 ("FCPA"), Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5), and 78ff(a).

      3.    **Waiver of Rights**:  Flowserve, on its own behalf and on behalf of Flowserve Pompes, knowingly waives its right to indictment on the charges described in Paragraph 2 and contained in the Information, as well as all rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and

Federal Rule of Criminal Procedure 48(b). In addition, Flowserve knowingly waives any objection based on venue to the filing of the Information and the Agreement in the United States District Court for the District of Columbia.

4.    **Acceptance of Responsibility**:  Flowserve admits, accepts, and acknowledges that it is responsible for the acts of its officers, employees, agents and its wholly-owned subsidiary, Flowserve Pompes, as set forth in the Statement of Facts attached to the Agreement as Appendix A. Should the Department initiate the prosecution deferred by this Agreement, Flowserve and Flowserve Pompes agree that they will neither contest the admissibility of, nor contradict, in any such proceeding, the facts contained in the Statement of Facts.

5.    **Monetary Penalty**: Flowserve agrees, on behalf of itself and Flowserve Pompes, to pay a monetary penalty of $4,000,000 to the U.S. Treasury within ten (10) days of this Agreement. This amount is a final payment and shall not be refunded: (a) if the Department moves to dismiss the Information pursuant to this Agreement; or (b) should the Department later determine that Flowserve or Flowserve Pompes has breached this Agreement and brings a prosecution against Flowserve Pompes. Further, nothing in this Agreement shall be deemed an agreement by the Department that this amount is the maximum criminal fine that may be imposed in any such prosecution and the Department shall not be precluded in such a prosecution from arguing that the Court should impose a higher fine. The Department agrees, however, that in the event of a subsequent breach and prosecution, it will recommend to the Court that the amount paid pursuant to this Agreement be offset against whatever fine the Court shall impose as part of its judgment. Flowserve and Flowserve Pompes understand that such a recommendation will not be binding on the Court.  Flowserve and Flowserve Pompes acknowledge that no tax deduction may be sought in connection with the payment of this $4,000,000 penalty.

6.    **Basis for Agreement**:  The Department enters into this Agreement based upon the following facts and circumstances: (a) Flowserve conducted a thorough investigation of the criminal conduct described in the Statement of Facts and other possible misconduct; (b) Flowserve promptly and thoroughly reported all of its findings to the Department; (c) Flowserve cooperated in the Department's investigation of this matter; and (d) Flowserve has undertaken, and has agreed to undertake, further remedial measures to ensure that this conduct will not recur.

7.    **Cooperation**:  This Agreement shall be in effect for three years. During the three-year term of the Agreement, Flowserve and Flowserve Pompes agree to cooperate fully with the Department and any other authority or agency, domestic or foreign, designated by the Department, in any investigation of Flowserve or Flowserve Pompes or any of their present and former directors, officers, employees, agents, consultants, contractors and subcontractors, or any other party, in any and all matters relating to corrupt payments in connection with the operations of Flowserve and Flowserve Pompes.  Flowserve and Flowserve Pompes agree that their cooperation shall include, but not be limited to, the following:

a.    Flowserve and Flowserve Pompes shall continue to cooperate fully with the Department, and with all other authorities and agencies designated by the Department, and

shall truthfully disclose all information with respect to the activities of Flowserve and Flowserve Pompes and their present and former subsidiaries and affiliates, and the directors, officers, employees, agents, consultants, contractors and subcontractors thereof, concerning all matters relating to corrupt payments in connection with their operations, related false books and records, and inadequate internal controls about which Flowserve and Flowserve Pompes have any knowledge or about which the Department shall inquire. This obligation of truthful disclosure includes the obligation of Flowserve and Flowserve Pompes to provide to the Department, upon request, any document, record, or other tangible evidence relating to such corrupt payments, books and records, and internal controls about which the Department inquires of Flowserve or Flowserve Pompes.

        i.       The Department specifically reserves the right to request that Flowserve and Flowserve Pompes provide the Department with access to information, documents, records, facilities and/or employees that may be subject to a claim of attorney-client privilege and/or the attorney work-product doctrine.

        ii.     Flowserve and Flowserve Pompes specifically reserve the right, upon written notice to the Department, to withhold access to information, documents, records, facilities and/or employees based upon an assertion of a valid claim of attorney-client privilege or application of the attorney work-product doctrine. Such notice shall include a general description of the nature of the information, documents, records, facilities and/or employees that are being withheld, as well as the basis for the claim.

        iii.    In the event that Flowserve and Flowserve Pompes withhold access to the information, documents, records, facilities and/or employees, the Department may consider this fact in determining whether Flowserve or Flowserve Pompes has fully cooperated with the Department.

        iv.    Except as provided in this paragraph, Flowserve and Flowserve Pompes shall not withhold from the Department, access to any information, documents, records, facilities and/or employees on the basis of an attorney-client privilege or work product claim.

        b.    Upon request of the Department, with respect to any issue relevant to its investigation of corrupt payments and false accounting in connection with the operations of Flowserve and Flowserve Pompes, or any of their present or former subsidiaries or affiliates, Flowserve and Flowserve Pompes shall designate knowledgeable employees, agents, or attorneys to provide to the Department the information and materials described in Paragraph 7(a) above, on behalf of Flowserve and Flowserve Pompes. It is further understood that Flowserve and Flowserve Pompes must at all times provide complete, truthful, and accurate information.

        c.    With respect to any issue relevant to the Department's investigation of corrupt payments and false accounting in connection with the operations of Flowserve and Flowserve Pompes, or any of their present or former subsidiaries or affiliates, Flowserve and Flowserve Pompes shall use their best efforts to make available for interviews or testimony, as requested by the Department, present or former directors, officers, employees, agents and

consultants of Flowserve and Flowserve Pompes, or any of their present or former subsidiaries or affiliates, as well as directors, officers, employees, agents and consultants of contractors and sub-contractors. This includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with federal law enforcement authorities. Cooperation under this paragraph will include identification of witnesses who, to the knowledge of Flowserve and Flowserve Pompes, may have material information regarding the matters under investigation.

        d.       With respect to any information, testimony, document, record, or other tangible evidence provided to the Department pursuant to this Agreement, Flowserve and Flowserve Pompes consent to any and all disclosures to other government agencies, whether agencies of the United States or a foreign government, of such materials as the Department, in its sole discretion, shall deem appropriate.

        8.     **Compliance Undertakings**: Flowserve and Flowserve Pompes represent that they will adhere to the requirements of Appendix B hereto and will implement a compliance and ethics program designed to detect and prevent violations of the FCPA and other applicable anti-corruption laws throughout their operations, including those of subsidiaries, affiliates, joint ventures, and contractors and subcontractors with responsibilities that include interactions with foreign officials. Implementation of these policies and procedures shall not be construed in any future enforcement proceeding as providing immunity or amnesty for any crimes not protected from prosecution by Paragraph 9 of this Agreement.

        9.     **Government Commitments**: In return for the full and truthful cooperation of Flowserve and Flowserve Pompes, and compliance with all the terms and conditions of this Agreement, the Department agrees as follows:

        a.   The Department will not use against Flowserve or any of its subsidiaries in any criminal or civil case any information in the attached Statement of Facts or any information Flowserve disclosed to the Department prior to the date of this Agreement concerning business activities of Flowserve or any of its subsidiaries with Iraq under the United Nations Oil for Food Program, except in a prosecution for perjury or obstruction of justice; in a prosecution for making a false statement; in a prosecution or other proceeding relating to any crime of violence; or in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.

        b.   Except as provided in this Agreement, the Department will not bring any criminal or civil case against Flowserve or any of its subsidiaries based upon the conduct described in the attached Statement of Facts, or the conduct disclosed by Flowserve to the Department prior to the date of this Agreement concerning business activities of Flowserve or any of its subsidiaries with Iraq under the United Nations Oil for Food Program. This paragraph does not provide any protection against prosecution for any corrupt payments or false accounting, if any, made in the future by Flowserve or Flowserve Pompes, or any directors, officers, employees, agents or consultants, whether or not disclosed by Flowserve or Flowserve Pompes, pursuant to the terms of this Agreement. This paragraph provides protection against

4

prosecution only with regard to those corrupt payments made in the past in connection with Flowserve or Flowserve Pompes' business activities in Iraq that: (i) are described in the attached Statement of Facts; or (ii) were disclosed to the Department prior to the date of this Agreement. This paragraph does not provide any protection against criminal prosecution of any present or former director, officer, employee, shareholder, agent, consultant, contractor, or subcontractor of Flowserve and Flowserve Pompes for any violations committed by them.

c. In consideration of the action of Flowserve in voluntarily conducting an investigation by outside legal counsel regarding the matters described in the attached Statement of Facts and other matters disclosed to the Department, the cooperation of Flowserve with the investigation conducted by the Department, and the willingness of Flowserve and Flowserve Pompes to: (i) acknowledge responsibility for their behavior and that of their subsidiaries, affiliates and agents; (ii) continue their cooperation with the Department; and (iii) adopt and maintain remedial measures and independently review and audit such measures, the Department agrees that any prosecution of Flowserve or Flowserve Pompes for the conduct set forth in the attached Statement of Facts, and for all other conduct Flowserve disclosed to the Department prior to the date of this Agreement concerning its business activities in Iraq under the United Nations Oil for Food Program, be and hereby is deferred for a period of three (3) years from the date of this Agreement.

10. **Terms of Dismissal**: The Department further agrees that if at the end of the three-year term of this Agreement, Flowserve and Flowserve Pompes are, and have been, in full compliance with all of their obligations under this Agreement, the Department will not continue the criminal prosecution against Flowserve Pompes described in Paragraph 2, will move to dismiss the Information, and this Agreement shall expire.

11. **Breach of Agreement**: If the Department determines, in its sole discretion, that Flowserve or Flowserve Pompes, at any time during the three-year term of this Agreement, have committed any crime which would constitute a felony under federal law; have provided deliberately false, incomplete, or misleading information under this Agreement; or have otherwise breached this Agreement, Flowserve and Flowserve Pompes shall, thereafter, be subject to prosecution for any federal criminal violation of which the Department has knowledge. Any such prosecution may be premised on information provided by Flowserve or Flowserve Pompes. Flowserve and Flowserve Pompes acknowledge that the Department has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if Flowserve or Flowserve Pompes breaches this Agreement and this matter proceeds to judgment. Flowserve and Flowserve Pompes further acknowledge that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of its discretion. In the event of a breach:

a. Flowserve and Flowserve Pompes agree that any prosecution that is not time-barred by the applicable statute of limitations on the date of this Agreement may be commenced against Flowserve or Flowserve Pompes in accordance with this Agreement, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the termination of this Agreement plus one year. Thus, by signing this agreement,

Flowserve, on behalf of itself and Flowserve Pompes, agrees that the statute of limitations with respect to any prosecution that is not time-barred on the date of this Agreement shall be tolled for the term of this Agreement, plus one year.  By this Agreement, Flowserve and Flowserve Pompes expressly intend to and do waive any rights with respect to the statute of limitations discussed herein.

          b.     All statements made by or on behalf of Flowserve or Flowserve Pompes to the Department or to the Court, including the attached Statement of Facts, and any testimony given by Flowserve or Flowserve Pompes before a grand jury or any tribunal, at any legislative hearings, or to the Securities and Exchange Commission ("SEC"), whether prior or subsequent to this Agreement, or any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Department against Flowserve or Flowserve Pompes, or one of them.

          c.     Flowserve and Flowserve Pompes shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by or on behalf of Flowserve or Flowserve Pompes prior or subsequent to this Agreement, or any leads derived there from, should be suppressed.  The decision whether conduct or statements of any individual will be imputed to Flowserve or Flowserve Pompes for the purpose of determining whether Flowserve or Flowserve Pompes has violated any provision of this Agreement shall be in the sole discretion of the Department.

     12.    **Successor Liability**:  Flowserve and Flowserve Pompes agree that in the event they sell, merge, or transfer all or substantially all of their business operations as they exist during the term of this Agreement, whether such sale is structured as a stock or asset sale, merger, or transfer, it shall include in any contract for sale, merger or transfer a provision binding the purchaser or any successor in interest thereto to the obligations described in this Agreement.

     13.    **Public Statements**:  Flowserve and Flowserve Pompes expressly agree that they shall not, through present or future attorneys, directors, officers, or any other person authorized to speak for them, make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by Flowserve and Flowserve Pompes set forth above or in the attached Statement of Facts. Any such contradictory statement shall, subject to cure rights below by Flowserve and Flowserve Pompes, constitute a breach of this Agreement and Flowserve and Flowserve Pompes thereafter shall be subject to prosecution as set forth in Paragraph 11 of this Agreement.  The decision whether any public statement by any such person contradicting the Statement of Facts will be imputed to Flowserve or Flowserve Pompes for the purpose of determining whether they have breached this Agreement shall be in the sole discretion of the Department.    If the Department determines that a public statement by any such person contradicts in whole or in part a statement contained in the Statement of Facts, the Department shall so notify Flowserve and Flowserve Pompes and they may avoid a breach of this Agreement by publicly repudiating such statement(s) within two (2) business days after notification. Consistent with the obligations of Flowserve and Flowserve Pompes set forth above, Flowserve

and Flowserve Pompes shall be permitted to raise defenses and to assert affirmative claims in civil and regulatory proceedings relating to the matters set forth in the Statement of Facts. This paragraph is not intended to apply to any statement made by any employee of Flowserve and Flowserve Pompes in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of Flowserve and Flowserve Pompes.

14.     **Statements to the Media**:  In connection with this Agreement, Flowserve and Flowserve Pompes shall only issue a press release if they first determine that the text of the release is acceptable to the Department.

15.     **Agreement Binding on Parties Only**:  It is understood that this Agreement is binding on Flowserve, Flowserve Pompes, and the Department, but does not bind any other federal agencies, or any state or local law enforcement or regulatory agencies, although the Department will bring the cooperation of Flowserve and Flowserve Pompes and their compliance with their obligations under this Agreement to the attention of such agencies and authorities if requested to do so by Flowserve or Flowserve Pompes.

16.     **Complete Agreement**: This Agreement sets forth all the terms of the Agreement between Flowserve, Flowserve Pompes, and the Department.  No modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Department, the attorneys for Flowserve and Flowserve Pompes, and a duly authorized representative of Flowserve and Flowserve Pompes.

17.    **Notice**:  Any notice to Flowserve under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service or registered or certified mail, in each case addressed to Ronald F. Shuff, Senior Vice President, Secretary & General Counsel, Flowserve Corporation, 5215 N. O'Connor Blvd., Suite 2300, Irving, TX 75039.   Notice shall be effective upon actual receipt by the Flowserve.   Notice to the Department shall be made to Mark F. Mendelsohn (or his successor), Deputy Chief, Fraud Section, Criminal Division, U.S. Department of Justice, 1400 New York Avenue, N.W., Washington, D.C. 20005.

**AGREED:**

**FOR FLOWSERVE CORPORATION**
**AND FLOWSERVE POMPES SAS:**

BARRY J. POLLACK, Esq.
Kelley Drye Collier Shannon
Counsel for Flowserve Corporation


RONALD F. SHUFF
Senior Vice President, Secretary & General Counsel
Flowserve Corporation

**FOR THE DEPARTMENT OF JUSTICE:**

STEVEN A. TYRRELL
Chief, Fraud Section

By:    STACEY LUCK
Trial Attorney, Fraud Section

MARK F. MENDELSOHN
Deputy Chief, Fraud Section

WILLIAM B. JACOBSON
Assistant Chief, Fraud Section

ROBERTSON T. PARK
Assistant Chief, Fraud Section

Criminal Division
United States Department of Justice
1400 New York Avenue, N.W.
Washington, DC 20005

Filed at Washington, D.C., on this **21**ˢᵗ day of **Feb.**, 2008.

8

17.    **Notice**: Any notice to Flowserve under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service or registered or certified mail, in each case addressed to Ronald F. Shuff, Senior Vice President, Secretary & General Counsel, Flowserve Corporation, 5215 N. O'Connor Blvd., Suite 2300, Irving, TX 75039. Notice shall be effective upon actual receipt by the Flowserve. Notice to the Department shall be made to Mark F. Mendelsohn (or his successor), Deputy Chief, Fraud Section, Criminal Division, U.S. Department of Justice, 1400 New York Avenue, N.W., Washington, D.C. 20005.

**AGREED:**

**FOR FLOWSERVE CORPORATION**
**AND FLOWSERVE POMPES SAS:**

BARRY J. POLLACK, Esq.
Kelley Drye Collier Shannon
Counsel for Flowserve Corporation

RONALD F. SHUFF
Senior Vice President, Secretary & General Counsel
Flowserve Corporation

**FOR THE DEPARTMENT OF JUSTICE:**

STEVEN A. TYRRELL
Chief, Fraud Section

By:   STACEY LUCK
Trial Attorney, Fraud Section

MARK F. MENDELSOHN
Deputy Chief, Fraud Section

WILLIAM B. JACOBSON
Assistant Chief, Fraud Section

ROBERTSON T. PARK
Assistant Chief, Fraud Section

Criminal Division
United States Department of Justice
1400 New York Avenue, N.W.
Washington, DC 20005

Filed at Washington, D.C., on this 21 day of Feb., 2008.

8

## OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with counsel for Flowserve Corporation ("Flowserve"). I understand the terms of this Agreement and voluntarily agree, on behalf of Flowserve, and its wholly-owned subsidiary, Flowserve Pompes SAS ("Flowserve Pompes"), to each of its terms. Before signing this Agreement, I consulted with counsel for Flowserve. Counsel fully advised me of the rights of Flowserve and Flowserve Pompes and of the consequences of entering into this Agreement.

I have carefully reviewed this Agreement with the Board of Directors of Flowserve. I have advised and caused investigative and outside counsel for Flowserve to advise the Board fully of the rights of Flowserve and Flowserve Pompes, of possible defenses, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf Flowserve and Flowserve Pompes, in any way to enter into this Agreement. I am also satisfied with counsel's representation in this matter. I certify that I am an officer of Flowserve and that I have been duly authorized by Flowserve to execute this Agreement on behalf of Flowserve and Flowserve Pompes.

Date: _2/20/08_                    By: _____
                                       LEWIS M. KLING
                                       President and Chief Executive Officer
                                       Flowserve Corporation

## CERTIFICATE OF COUNSEL

We are counsel for Flowserve Corporation ("Flowserve") in the matter covered by this Agreement. In connection with such representation, we have examined relevant documents and have discussed this Agreement with the Board of Directors. Based on our review of the foregoing materials and discussions, we are of the opinion that: (1) Flowserve's representative has been duly authorized to enter into this Agreement on behalf of Flowserve and its wholly-owned subsidiary Flowserve Pompes; and (2) this Agreement has been duly and validly authorized, executed, and delivered on behalf of Flowserve and Flowserve Pompes and is a valid and binding obligation of Flowserve and Flowserve Pompes. Further, I have carefully reviewed this Agreement with the Board of Directors and General Counsel of Flowserve. I have fully advised them of the rights of Flowserve and Flowserve Pompes, of possible defenses, and of the consequences of entering into this Agreement. To my knowledge, the decision by Flowserve to enter into this Agreement is an informed and voluntary one.

Date: 2/21/08

BARRY J. POLLACK, Esq.
Kelley Drye Collier Shannon
Counsel for Flowserve Corporation

## APPENDIX A

## STATEMENT OF FACTS

The following Statement of Facts is incorporated by referenced as part of the Agreement (the "Agreement") between the United States Department of Justice (the "Department") and Flowserve Corporation ("Flowserve"), on behalf of itself and its wholly-owned subsidiary, Flowserve Pompes SAS ("Flowserve Pompes"), and the parties hereby agree and stipulate that the following information is true and accurate. As set forth in Paragraph 4 of the Agreement, Flowserve admits, accepts and acknowledges that it is responsible for the acts of its officers and employees, and those of its wholly-owned subsidiary, Flowserve Pompes, that are set forth below. Should the Department initiate the prosecution that is deferred by the Agreement, Flowserve and Flowserve Pompes agree that they will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding. If this matter were to proceed to trial, the United States would prove beyond a reasonable doubt, by admissible evidence, the facts alleged in the Information. This evidence would establish the following:

**I.    The United Nations Oil-For-Food Program**

1.    On or about August 6, 1990, days after Iraq's invasion of Kuwait, the United Nations ("U.N.") adopted Security Council Resolution 661, which prohibited U.N. member-states from transacting business with Iraq, except for the purchase and sale of humanitarian supplies. Resolution 661 prohibited virtually all direct financial transactions with the government of Iraq.

2.    On or about April 15, 1995, the U.N. adopted Security Council Resolution 986, which served as a limited exception to the Iraq sanctions regime in that it allowed Iraq to sell its oil. However, Resolution 986 required that the proceeds from oil sales be used by the Iraqi

government to purchase humanitarian supplies, including but not limited to food, for the Iraqi people. Hence, this program became known as the Oil for Food Program ("OFFP"). Payments made to the Iraqi government which were not approved by the U.N. and which were outside the strict contours of the OFFP were prohibited.

3.     The rules of the OFFP required that the proceeds from all sales of Iraqi oil be deposited into a U.N.-controlled escrow account at the New York branch of Banque Nationale de Paris ("BNP-Paribas"). That escrow account funded the purchase of humanitarian goods by the Iraqi government.

4.     Under the rules of the OFFP, a supplier of humanitarian goods contracted with a ministry or other department of the Iraqi government to sell goods to the government. Once that contract was finalized, the contract was submitted to a U.N. Committee ("the 661 Committee") which reviewed the contracts to ensure that their terms complied with all U.N., OFFP, and Iraqi sanction regulations. The 661 Committee accepted the contracts, rejected them or asked the supplier to provide additional information upon which the 661 Committee could make a decision.

5.     If a contract was approved by the 661 Committee, a letter of credit was issued by the New York branch of BNP-Paribas to the supplier's bank stating that the supplier would be paid by the OFFP for the relevant goods once certain conditions were met, including delivery of the goods to Iraq and inspection of the goods by a U.N. contractor. Once those conditions were deemed by the U.N. to have been met, the U.N. would direct BNP-Paribas to release payment to the supplier.

6.     On or about December 10, 1996, the first Iraqi oil exports under the OFFP began. The OFFP continued from in or about December 1996 until the United States invasion of Iraq on

2

or about March 19, 2003. From in or about December 1996 through March 2003, the United States government prohibited United States companies and individuals from engaging in transactions with the government of Iraq, unless such transactions were authorized by the U.N. pursuant to the OFFP.

7.      Beginning in approximately August 2000, the Iraqi government demanded that suppliers of humanitarian goods pay a kickback, usually valued at 10% of the contract price, to the Iraqi government in order to be awarded a contract by the government. These kickbacks violated U.N. OFFP regulations and sanctions which prohibited payments to the Iraqi government which were not expressly approved by the U.N. and which were not contemplated by the guidelines of the OFFP.

8.      Often, these kickbacks were termed "after sales service fees" ("ASSFs"), but did not represent any actual service being performed by the supplier. These ASSFs were usually included in the contract price submitted by the supplier to the U.N. without the U.N. knowing that the contract contained an extra 10% which would be returned to the Iraqi government. Including the 10% in the contract price allowed the supplier to avoid paying the 10% out of its profits; instead, the suppliers caused the U.N., unknowingly, to fund the kickbacks to the Iraqi government.

9.      Some suppliers labeled the ASSFs as such, thereby leading the U.N. to believe that actual after-sales services were being provided by the supplier. Other suppliers disguised the ASSFs by inserting fictitious line items into the contracts for goods or services that were not being provided. Still other suppliers simply inflated their contract prices by 10% to account for the payments they would make, or cause to be made, to the Iraqi government.

3

## II.    Relevant Entities and Individuals

10.    Flowserve Pompes SAS ("Flowserve Pompes"), the defendant, was a French corporation, headquartered in Arnage, France.    Flowserve Pompes was a wholly-owned subsidiary of Flowserve Corporation ("Flowserve").

11.    Flowserve, a New York corporation, was an international manufacturer of pumps, valves, seals, and related parts for the oil, gas, and chemical industries, headquartered in Irving, Texas. Flowserve was publicly traded on the New York Stock Exchange.  Flowserve issued and maintained a class of publicly-traded securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78l, and was required to file periodic reports with the United States Securities and Exchange Commission under Section 13 of the Securities Exchange Act, 15 U.S.C. § 78m.  Accordingly, Flowserve was an "issuer" within the meaning of the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78dd-1(a).  By virtue of its status as an issuer within the meaning of the FCPA, Flowserve was required to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflected the transactions and disposition of assets of Flowserve and its subsidiaries, including those of Flowserve Pompes, the books, records and accounts of which were incorporated into the books, records and accounts of Flowserve.

12.    Employee A, a citizen of Lebanon, was the Beirut Regional Manager for Flowserve Pompes located in Beirut, Lebanon.

13.    Employee B, a dual citizen of Algeria and France, was the General Manager for Flowserve Pompes located in Arnage, France.

14.    Employee C, a citizen of Lebanon, was the Beirut Area Manager for Flowserve Pompes located in Beirut, Lebanon.

4

15.    Employee D, a citizen of France, was the President of Flowserve Pompes located in Arnage, France.

16.    Company X was a Jordanian company that acted as an agent for Flowserve Pompes in connection with sales made through the OFFP.

**III.    Overview of the Flowserve Pompes' Kickback Scheme**

17.    From approximately 1997 to 2003, Flowserve Pompes participated in the OFFP. From in or about April 2001 through September 2002, Flowserve Pompes was awarded a total of nineteen (19) OFFP contracts for the sale of large-scale water pumps and spare parts for use in oil refineries in Iraq.    To obtain these contracts, from July 2002 through February 2003, Flowserve Pompes paid, directly or indirectly, or offered to pay, approximately $778,409 in kickbacks to the government of Iraq.

18.    Flowserve Pompes entered into the first of the nineteen (19) direct contracts with the Iraqi Ministry of Oil in April 2001.    Employees from Flowserve Pompes' Beirut, Lebanon sales office negotiated the contracts with Iraqi government officials.    Once the contracts were negotiated, employees from Flowserve Pompes' Arnage, France office approved the contracts.

19.    To obtain the Iraqi contracts, Flowserve Pompes agreed to pay the Iraqi government kickbacks worth 10% of the total contract value.    To memorialize the kickback agreement, for most of the contracts awarded by the Iraqi Ministry of Oil, Flowserve Pompes executed a separate side letter agreement with the Iraqi Ministry of Oil stating that Flowserve Pompes would pay 10% of the contract price to cover ASSFs such as "engineering services, installation, and commission."    It was understood by the Flowserve Pompes officials and the Iraqi government officials that, despite the language of the side letter agreement, no such

5

services would be performed and that the payments were kickbacks in exchange for the award of the contracts. The side letter agreement was not disclosed to the U.N.

20.     Flowserve Pompes paid the kickbacks to the Iraqi government through its agent, Company X. On or about the date of Flowserve Pompes' shipments to Iraq, Company X sent an invoice to Flowserve Pompes requesting reimbursement for either "local technical services provided on your behalf" or "payments made on your behalf." Flowserve Pompes then issued a payment to Company X within days. Company X paid the kickback to the Iraqi government by depositing cash into an Iraqi-controlled account in the Jordanian Housing Bank for Trade and Finance.

21.     Flowserve Pompes falsified internal accounting records to conceal the nature of the payments to the Iraqi government. These records made it appear that Flowserve Pompes had paid its agent, Company X, a 10% fee on each contract to pay for Company X's installation and service of the equipment, even though Flowserve Pompes knew that Company X had provided no such services and that the 10% fee was a kickback to the Iraqi government.

22.     In order to generate the funds to pay the kickbacks to the Iraqi government and to conceal those payments from the U.N., Flowserve Pompes inflated the unit price of each piece of equipment by 10% before submitting the contracts to the U.N. for approval.

23.     After the U.N. approved the contracts, BNP-Paribas issued letters of credit, via international wire communication, to the bank used by Flowserve Pompes, in the amount of the contract price. These letters of credit authorized Flowserve Pompes to be paid the amounts specified in the contracts, which included the 10% kickbacks to be paid to the Iraqi government.

24.     In total, Flowserve Pompes paid kickbacks to the Iraqi government in relation to fifteen (15) separate contracts. In addition, Flowserve Pompes offered to pay kickbacks to the

6

Iraqi government in relation to four (4) other contracts. Delivery under the four (4) additional contracts was not completed prior to the U.S. invasion of Iraq in March 2003, after which the Coalitional Provisional Authority ordered that the Flowserve Pompes' contracts be reduced by 10%.

**IV.    Details of Flowserve Pompes' Kickback Scheme**

      **A.    Flowserve Pompes' Initial Authorization to Pay Kickbacks**

25.    On or about November 28, 2000, Employee A and Employee B, discussed paying the Iraqi government kickbacks in the amount of 10% of the total contract value for all contracts awarded by the Iraqi Ministry of Oil in the future.

26.    On or about January 22, 2001, Employee A sent a facsimile to Employee B requesting authorization to pay the Iraqi government a 10% kickback for contracts in the future and characterized the payment as a charge for "engineering service, installation and commission."

27.    On or about January 23, 2001, Employee B sent a facsimile to Employee A authorizing the 10% kickback and confirming that the kickbacks could be paid because "the mechanism of payment of 10% marketing fees is now in place."

28.    From in or about April 2001 through September 2002, Flowserve Pompes entered into at least nineteen (19) separate contracts with the Iraqi Ministry of Oil.

      **B.    Flowserve Pompes' U.N. Contract DR/08/34**

29.    On or about April 26, 2001, Employee C, on behalf of Flowserve Pompes, executed a contract, referenced by the U.N. as Contract No. DR/08/34, with the Iraqi Ministry of Oil Economic and Finance Department to supply a complete set of "centrifugal pumps with

motors" for €110,000, which included an extra 10% to be paid as a kickback to the Iraqi government.

30. In or about April 2001, Employee C, on behalf of Flowserve Pompes, executed a side letter agreement with the Iraqi Ministry of Oil to pay the ministry €10,900 as a kickback for U.N. Contract No. DR/08/34.

31. From in or about June 2001 to October 2001, Employee C caused a Purchase Order form to be created and submitted to the U.N. for approval under U.N. Contract No. DR/08/34 for the sale of two (2) centrifugal electric pumps in which the unit price was increased 10% and listed as €55,000 per pump.

32. On or about July 16, 2002, Company X sent an invoice to Flowserve Pompes for €47,612.70, which included the €10,900 kickback payment to be paid to the Iraqi government under U.N. Contract No. DR/08/34, and which falsely characterized the kickback payment to the Iraqi government as a payment for "local technical services provided on your behalf" even though Company X had provided no such technical services.

33. In or about October 2002, Flowserve Pompes caused Company X to pay a kickback to the Iraqi government in the amount of €10,900.

34. In or about October 2002, Flowserve Pompes caused two (2) centrifugal electric pumps purchased pursuant to U.N. Contract No. DR/08/34 to be delivered to Iraq, prompting a company based in Geneva, Switzerland, that provided commercial inspection services on behalf of the U.N. in Iraq ("the inspection company") to send a facsimile from Iraq to the U.N. in New York notifying the U.N. that the products had been received and inspected upon entry into Iraq. This notification, in turn, triggered payment by the U.N. to Flowserve of €110,000 for U.N. Contract No. DR/08/34.

8

C.    **Flowserve Pompes' Eighteen Additional Contracts**

35.    In addition to U.N. Contract No. DR/08/34, between in or about April 2001 and in or about September 2002, Flowserve Pompes entered into at least eighteen (18) other contracts with the Iraqi Ministry of Oil in return for which Flowserve Pompes paid or offered to pay kickbacks to the Iraqi government. Flowserve Pompes' execution of each of these contracts was a separate overt act in furtherance of the conspiracy. The total value of the kickbacks paid to the Iraqi government, in connection with fifteen (15) of the contracts, was approximately $604,651. The total value of the additional four (4) kickback payments that were authorized, but not paid, was approximately $173,758. Each kickback that was paid or offered was a separate overt act in furtherance of the conspiracy. The eighteen (18) additional contracts were executed, and the kickback payments were made or offered, as specified below:

| U.N. Contract Number | Date of Execution | Contract Value | Items Purchased | Kickback Paid to the Iraqi Government | Kickback Authorized but not Paid to the Iraqi Government |
|---|---|---|---|---|---|
| DR/08/30 | 04/26/01 | € 278,894 | Complete centrifugal pumps | $28,756.59 | |
| DR/08/31 | 04/26/01 | € 737,080 | Complete pumps / complete centrifugal pumps | $77,704.70 | |
| DR/08/32 | 04/26/01 | € 175,934 | Pumps driven by motors/complete centrifugal pumps with motors | $19,883.72 | |
| DR/09/02 | 05/12/01 | € 1,656,077 | New pumps to crude distillation units | $166,169.35 | |
| NGI/09/20 | 06/25/01 | € 37,300 | Diesel pump and spare parts | | $3,688.03 |

9

| U.N. Contract Number | Date of Execution | Contract Value | Items Purchased | Kickback Paid to the Iraqi Government | Kickback Authorized but not Paid to the Iraqi Government |
|---|---|---|---|---|---|
| NGI/09/17 | 06/25/01 | € 301,396 | Spare part for existing rotating equipment (pumps) | | $35,157.89 |
| SOC/08/177 | 07/15/01 | € 250,653 | Spare parts for Ingersoll – Dresser pumps | $25,899.25 | |
| SOC/08/179 | 07/15/01 | € 34,590 | Spare parts for fire fighting pumps | $3,552.52 | |
| SOC/09/131 | 07/15/01 | € 17,351 | Pump and spare parts for Ingersoll-Dresser Pumps | $1,781.63 | |
| SOC/09/185 | 07/15/01 | € 258,535 | Spare parts for water pump different types & capacities | $26,552.68 | |
| SOC/08/178 | 07/16/01 | € 341,074 | Spare parts for pumps of different types | $33,842.08 | |
| NGI/08/06 | 07/25/01 | € 724,049 | Spare part for existing rotating equipment | $74,364.00 | |
| NGI/08/33 | 07/25/01 | € 161,362 | Pumps with recommended spare parts | $16,011.48 | |
| SRC/08/21 | 08/29/01 | € 721,709 | Spares for existing rotating equipment (pumps) | $71,104.01 | |
| SRC/09/23 | 08/29/01 | € 161,962 | Replacement of damaged pumps with spares | $15,119.52 | |
| DR/08/66 | 08/30/01 | € 315,180 | Pumps complete drive by motors / complete pump with motor | $31, 595.48 | |
| NGI 10/36 | 12/10/01 | € 841,201 | Spare parts for existing rotating equipment | | $89,513.77 |

| U.N. Contract Number | Date of Execution | Contract Value | Items Purchased | Kickback Paid to the Iraqi Government | Kickback Authorized but not Paid to the Iraqi Government |
|---|---|---|---|---|---|
| GF 11/27 | 9/23/02 | € 421,034 | Spare parts for L.P.G. filling plants | | $45,397.88 |

### D.    Flowserve and Flowserve Pompes' Books and Records

36.    From in or about 2001 through in or about 2003, Employee D and others falsely characterized Flowserve Pompes' kickback payments to the Iraqi government in Flowserve Pompes' books, records and accounts as payments to Company X for "Field Services" including "supervision, installation, commission, [and] startup," even though Flowserve Pompes was aware that Company X had provided no such services and a substantial portion of the money it paid to Company X was being passed on to the Iraqi government in exchange for being awarded contracts.

37.    At the end of Flowserve's fiscal year, in 2001 and 2002, the books, records and accounts of Flowserve Pompes, including those containing false characterizations of the payments to the Iraqi government, were incorporated into the books, records and accounts of Flowserve for purposes of preparing Flowserve's year-end financial statements.

11

## APPENDIX B

In order to address potential deficiencies in Flowserve Corporation's internal controls, policies and procedures regarding compliance with the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §§ 78dd-1, *et seq.*, and other applicable anti-corruption laws, Flowserve Corporation and its subsidiaries and affiliates (collectively, "Flowserve") agree to conduct, in a manner consistent with all of its obligations under this Agreement, a review of its existing internal controls, policies and procedures.

Where necessary and appropriate, Flowserve agrees to adopt new or modify existing internal controls, policies and procedures in order to ensure that it maintains: (a) a system of internal accounting controls designed to ensure that Flowserve makes and keeps fair and accurate books, records and accounts; and (b) a rigorous anti-corruption compliance code, standards and procedures designed to detect and deter violations of the FCPA and other applicable anti-corruption laws. At a minimum, this should include, but ought not be limited to, the following elements:

1.    A clearly articulated corporate policy against violations of the FCPA and other applicable anti-corruption laws;

2.    A system of financial and accounting procedures, including a system of internal accounting controls, designed to ensure the maintenance of fair and accurate books, records and accounts;

3.    Promulgation of a compliance code, standards and procedures designed to reduce the prospect of violations of the FCPA, other applicable anti-corruption laws, and Flowserve's compliance code. These standards and procedures should apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of Flowserve

in a foreign jurisdiction, including agents, consultants, representatives, distributors, teaming partners, and joint venture partners (collectively referred to as "agents and business partners").

4.    The assignment of one or more senior corporate officials of Flowserve to the implementation and oversight of compliance with policies, standards and procedures regarding the FCPA and other applicable anti-corruption laws.  Such corporate official(s) shall have the authority to report matters directly to Flowserve Corporation's Audit Committee of the Board of Directors.

5.    Mechanisms designed to ensure that Flowserve's policies, standards and procedures regarding the FCPA and other applicable anti-corruption laws are effectively communicated to all directors, officers, employees and, where necessary and appropriate, agents and business partners.  This should include:  (a) periodic training for all directors and officers, and, where necessary and appropriate, employees, agents and business partners; and (b) annual certifications by all directors and officers, and, where necessary and appropriate, employees, agents and business partners, certifying compliance therewith.

6.    An effective system for reporting suspected criminal conduct and/or violations of the compliance policies, standards, and procedures regarding the FCPA and other applicable anticorruption laws for directors, officers, employees, agents and business partners.

7.    Appropriate disciplinary procedures to address, among other things, violations of the FCPA, other applicable anti-corruption laws, and Flowserve's compliance code, standards and procedures by Flowserve's directors, officers, and employees.

8.    Appropriate due diligence requirements pertaining to the retention and oversight of agents and business partners.

9.    Standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are reasonably calculated to prevent violations of the FCPA and other applicable anti-corruption laws, which may, depending upon the circumstances, include:   (a) anticorruption representations and undertakings relating to compliance with the FCPA and other applicable anti-corruption laws; (b) rights to conduct audits of the books and records of the agent or business partner to ensure compliance with the foregoing; and (c) rights to terminate an agent or business partner as a result of any breach of anti-corruption laws or representations and undertakings related to such matters.